IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CHARLES ROYE, JR.,                )
    Plaintiff,                         )
                      )
        v.                              )     CIVIL NO. 3:12cv783(JAG)
                      )
CAROLYN W. COLVIN,                )
Commissioner of Social Security,  )
    Defendant.                        )
_____)

REPORT AND RECOMMENDATION

Charles Roye ("Plaintiff") is 38 years old and previously worked as an innkeeper, steward, baker, mental health worker and chef. On May 29, 2008, Plaintiff applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), claiming disability due to the residual effects of a stroke, including left-sided weakness, visual impairment and frequent headaches. Plaintiff's claim was presented to an Administrative Law Judge ("ALJ"), who denied Plaintiff's requests for benefits. The Appeals Council subsequently denied Plaintiff's request for review on August 30, 2012. Plaintiff now challenges the ALJ's decision, claiming that the ALJ did not indicate whether he considered the most applicable Listing, that he erred in assigning less than controlling weight to Plaintiff's treating physician and that he failed to properly assess Plaintiff's credibility. (Pl.'s Mem. of Points and Author. in Supp. of Mot. for Summ. J. "Pl.'s Mem." (ECF No. 9) at 11-21.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe

for review.[1]  Having reviewed the parties' submissions and the entire record in this case, the

Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B).  For the reasons that follow, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 7) be DENIED; that Defendant's Motion for Summary Judgment

(ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges the ALJ's decision; as such, his education and work history, medical

history, medical opinions, reported activities of daily living ("ADLs") and hearing testimony are

summarized below.

A.      Plaintiff's Education and Work History.

Plaintiff obtained a Bachelor's degree in culinary arts and restaurant management.  (R. at

36, 53.)  He most recently worked as an innkeeper at a bed and breakfast for about six months

before he had the stroke.  (R. at 50.)  Also, he previously worked as a steward on a cruise ship

for twelve weeks and as a baker for about a year.  (R. at 201.)  Before that, he was a mental

health worker for twelve years and a chef for ten years.  (R. at 201.)

B.      Plaintiff's Medical History.

On March 2, 2008, Plaintiff was brought to the emergency room at Miriam Hospital

("Miriam") by an ambulance after a friend found him on the floor incontinent of urine and

---

[1]      The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

unable to speak or stand. (R. at 256.) Before being brought to the emergency room, he had been experiencing left-sided weakness, dysarthria and inability to get off the floor for about twelve hours. (R. at 256.) Plaintiff was found to have had a right-sided ischemic stroke and was admitted to the ICU for monitoring. (R. at 256.) He stayed in the ICU for twenty-four hours. (R. at 256.)

After being transferred from intensive care, Plaintiff was admitted to the Medicine Teaching Service where imaging was performed to determine the cause of his infarction. (R. at 257.) A CT scan was conducted and revealed an acute right middle cerebral artery ("MCA") territory infarction. (R. at 257.) Plaintiff was also seen by neurology which recommended that the patient be placed on Dilantin and continued on Dilantin for seizure prophylaxis. (R. at 257.) Neurology felt that the stroke was most likely caused by his right internal carotid artery dissection with thrombosis or thrombus formation and recommended anti-coagulation therapy. (R. at 257.) While in the hospital, Plaintiff was diagnosed with cerebrovascular accident ("CVA") and anemia. (R. at 258.) Plaintiff was prescribed Dilantin and was placed on anti-coagulation therapy, during which time his mental status showed improvement. (R. at 257.) Plaintiff was also started on aspirin for treatment of his stroke and Lipitor for prevention of future strokes. (R. at 258.)

Plaintiff was seen by Physical Therapy and Occupational Therapy on a daily basis, and he improved dramatically over the first two weeks of his stay. (R. at 258.) He regained strength in his left lower extremity, his left upper extremity and his facial droop improved. (R. at 258.) Also, his mental status returned to baseline. (R. at 259.) Plaintiff was then discharged from Miriam on April 5, 2008. (R. at 256.)

3

On April 11, 2008, Plaintiff was seen at Northern Neck Free Hospital Clinic ("NNFC") for a check-up. (R. at 314.) He stated that he had a blind spot in his eye and complained of right-sided weakness. (R. at 314.) On August 12, 2008, Plaintiff returned to NNFC for a follow-up and reported being fatigued. (R. at 314.)

On September 30, 2008, Plaintiff returned to Miriam, stating that he was unable to see out of his left eye and reporting continued residual left arm and hand weakness. (R. at 19, 332.) An examination showed that he had discoloration and slight hyperpigmentation of inferior pole of his right iris. (R. at 333.) Also, the examination revealed 4/5 motor strength in his left upper extremities and 5/5 motor strength in his left lower extremity. (R. at 333.) Plaintiff was referred to a neurologist to examine his decrease in vision on the left side. (R. at 333.) On February 16, 2009, Plaintiff went back to NNFC, reporting chest pain with recent treatment in the emergency room diagnosed as a muscle strain. (R. at 439.)

On March 5, 2009, Plaintiff presented to Rhode Island Hospital for a follow-up of his stroke and he also reported on-going problems with his vision. (R. at 378.) Plaintiff stated that he could not see an on-coming bus until it had actually passed him and that there had been times when he was almost hit by on-coming traffic because of these vision problems. (R. at 378.) He reported that he did not drive, but he was able to read papers and printed material without difficulty. (R. at 378.) Doctors noted that Plaintiff had used drugs in the past, including cocaine and marijuana, but stated that his stroke did not occur as a result of the drug usage. (R. at 378.) Physical examination revealed that visual acuity of the left eye on near vision was 20/30 and the right was 20/400. (R. at 379.) He had no facial asymmetry. (R. at 379.) He had a mild left pronator drift and a 4+/5 left arm extensor weakness and a left leg flexor weakness, but

4

otherwise his strength was 5/5 bilaterally. (R. at 379.)  Plaintiff was intact to finger-nose and heel-shin testing. (R. at 379.)  His reflexes were 2+ throughout on the right and 3+ throughout on the left. (R. at 379.)  Plaintiff was referred to Ophthalmology for formal visual field testing and for testing of his visual acuity because of his reported visual problems. (R. at 379.)

On September 1, 2009, Plaintiff visited the NNFC for a routine visit and to refill his medications. (R. at 437.)  On November 3, 2009, Plaintiff returned to the NNFC and he complained of having daily headaches for the past four to five months. (R. at 436.)  The headaches lasted until he took medication. (R. at 436.)  Plaintiff was diagnosed with headaches, hypertension and depression. (R. at 436.)  He was prescribed Zoloft and was referred to neurology. (R. at 436.)

On December 2, 2009, Plaintiff returned to the NNFC for a follow-up visit. (R. at 435.)  He complained of daily headaches and reported that his medication was helping alleviate them. (R. at 435.)  On January 12, 2010, Plaintiff again complained of experiencing headaches on a daily basis. (R. at 434.)  On January 28, 2010, Plaintiff reported that he was still experiencing daily headaches that came and went. (R. at 433.)  He stated that the headaches did not involve dizziness or syncope. (R. at 433.)  On February 8, 2010, Plaintiff was seen for hypertension and reported that he was feeling well and that the Ultram was really helping his headaches. (R. at 432.)   Plaintiff returned on July 15, 2010, and he complained of continuing to have headaches in the afternoon. (R. at 431.)  The doctor determined that Plaintiff suffered from chronic headaches and refilled his medications. (R. at 431.)

5

1.    The Opinion of Helene Bradley, O.D., Treating Optometrist.

Dr. Bradley wrote a letter dated August 20, 2009, stating that he examined Plaintiff on April 15, 2009, and August 12, 2009, for a low vision evaluation. (R. at 383.) He reported that Plaintiff was visually impaired secondary to cerebral visual accident resulting in a left homonymous hemianopia. (R. at 383.) Plaintiff's uncorrected distance visual acuities were 20/100 in his right eye and 20/50 in his left eye. (R. at 383.) Plaintiff's uncorrected near visual acuities were 1M in his right eye and .8M in his left eye. (R. at 383.) In a letter dated November 20, 2009, Dr. Bradley wrote that he had re-examined Plaintiff on October 28, 2009 for another low vision evaluation. (R. at 384.) Plaintiff complained of headaches, especially in the sunlight. (R. at 384.) Dr. Bradley recommended Cocoon Sunglasses with a dark grey tint. (R. at 384.)

Dr. Bradley completed a Vision Impairment Questionnaire dated November 3, 2010. (R. at 449–454.) Dr. Bradley diagnosed Plaintiff with left homonymous hemianopia in both his left and right eyes and reported that Plaintiff needed glasses. (R. at 449.) Dr. Bradley reported that the prognosis for Plaintiff's right and left eyes was stable. (R. at 449–450.) The clinical findings that supported Dr. Bradley's diagnoses were a 20/20 central visual acuity in Plaintiff's right and left eyes, restricted field of vision on the right and left, limited visual efficiency on the right, and left and difficulty with mobility on the right and left. (R. at 450–51.) In support of his diagnoses, Dr. Bradley cited visual field testing that showed total defect on the left visual field. (R. at 452.) Plaintiff had no vision on the left side, bumped into obstacles on the left and lost his place when reading. (R. at 452.) Dr. Bradley reported that Plaintiff's impairments would affect his mobility and ability to read. (R. at 453.) Also, Dr. Bradley reported that Plaintiff's experience of pain or other symptoms was never severe enough to interfere with attention and

6

concentration. (R. at 453.) He stated that Plaintiff was not a malingerer and that he expected Plaintiff's impairments to last at least twelve months. (R. at 453.) As a result of his vision problems, Plaintiff would need to take unscheduled breaks every two hours to rest during an eight-hour workday and would need to rest for fifteen minutes before returning to work. (R. at 453.) Dr. Bradley stated that Plaintiff's impairments were unlikely to produce "good days" and "bad days" and that Plaintiff would need to be absent from work less than once a month. (R. at 453–54.)

2.     The Opinion of Catherine Ham, M.D., Treating Neurophysiologist.

Plaintiff visited Catherine Ham, M.D. on April 14, 2010. (R. at 393–94.) Dr. Ham noted that Plaintiff had left homonymous, left-sided weakness, left dysarthria and left facial droop. (R. at 393.) He had no aphasia. (R. at 393–94.) Dr. Ham reported that Plaintiff had jerky saccades and decreased left nasolabial fold. (R. at 394.) The examination also revealed abnormal cranial nerves and hyperreflexia on the left side. (R. at 394.) On May 6, 2010, a CTA scan of the head revealed multiple large areas of encephalomalacia in the right frontal, parietal and temporal lobes. (R. at 396.)

Plaintiff returned to Dr. Ham on August 11, 2010, and complained of headaches that were alleviated by Elavil and reported that it hurt to think and read. (R. at 444.) Dr. Ham noted that Plaintiff had 0/10 pain and that he was borderline legally blind. (R. at 444.) Plaintiff appeared alert, awake and oriented. (R. at 444.) An examination revealed left facial droop and increased left deep tendon reflexes. (R. at 444.) Plaintiff's CTA was normal and he had normal carotid and cranial nerves, aside from cranial nerve number seven. (R. at 444–45.)

On October 6, 2010, Plaintiff returned to Dr. Ham and complained of the spontaneous left ICA dissection. (R. at 446.) Dr. Ham noted that Plaintiff had been hit by a car on the left and had inattention. (R. at 446.) Also, Dr. Ham stated that Plaintiff was stable, alert, awake and oriented. (R. at 446.) Plaintiff's aphasia and dysarthria were improving. (R. at 446.) He had increased left deep tendon reflexes and apraxia of his left arm, but he had 4/5 strength in his left arm and leg. (R. at 446–47.) Plaintiff had normal optic fundi, normal sensation and normal gait. (R. at 446.)

On September 2, 2010, Dr. Ham completed a Stroke Residual Functional Capacity Questionnaire. (R. at 386–391.) Dr. Ham stated that Plaintiff had an ischemic stroke and diagnosed him with a poor prognosis. (R. at 386.) Plaintiff's symptoms were balance problems, poor coordination, loss of manual dexterity, vertigo/dizziness, headaches, difficulty remembering, weakness, slight paralysis, numbness, depression, difficulty solving problems, sensory disturbance, pain, fatigue and visual problems. (R. at 386.)

Dr. Ham stated that Plaintiff could never lift less than ten pounds. (R. at 387.) Plaintiff could never twist, stoop, crouch, climb ladders or climb stairs. (R. at 387.) Dr. Ham reported that Plaintiff had significant limitations in reaching, handling or fingering. (R. at 387.) Plaintiff could not use his left hand to grasp, turn or twist objects during an eight-hour workday. (R. at 387.) Plaintiff could use his right hand to grasp, turn or twist objects 50% of the time during an eight-hour workday. (R. at 387.) He could use his right fingers for fine manipulations 75% of the time, but could not use his left fingers for fine manipulations at all. (R. at 387.) Plaintiff could use his right arm for reaching 50% of the time during an eight-hour workday and could not use his left arm at all during the day. (R. at 387.) Dr. Ham reported that Plaintiff could sit for

8

less than two hours total in an eight-hour workday. (R. at 388.) Plaintiff would need to take

unscheduled breaks during an eight-hour workday about every forty-five minutes. (R. at 388.)

Plaintiff would have to rest for about sixteen hours before returning to work. (R. at 388.) Dr.

Ham stated that with prolonged sitting, Plaintiff's legs should be elevated at about thirty to forty-

five degrees. (R. at 388.) If Plaintiff had a sedentary job, he would need to elevate his legs 25%

of the time. (R. at 388.) Also, Plaintiff would need to use a cane or other assistive device for

occasional standing or walking. (R. at 388.)

　　　Dr. Ham reported homonymous hemianopia as her clinical findings. (R. at 389.)

Plaintiff was not a malingerer and had significant and persistent disorganization of motor

function in two extremities that resulted in sustained disturbance of gross and dexterous

movement or gait and station. (R. at 389.) Dr. Ham reported that Plaintiff's impairments were

reasonably consistent with the symptoms and functional limitations described in this evaluation.

(R. at 389.) Plaintiff constantly experienced pain, fatigue or other symptoms severe enough to

interfere with attention and concentration. (R. at 389.) Dr. Ham reported that Plaintiff's

impairments lasted or could be expected to last at least twelve months. (R at 389.) Plaintiff

could walk zero city blocks without rest and could only sit for forty-five minutes at a time before

needing to get up. (R. at 389.) Dr. Ham reported that Plaintiff could stand for zero hours at a

time before needing to sit down or walk around. (R. at 389.) Further, Plaintiff would need to

avoid concentrated exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts,

gases, soldering fluxes, solvents/cleaners and chemicals. (R. at 390.) Dr. Ham reported that

Plaintiff was capable of tolerating low stress jobs and his impairments likely would produce

9

"good days" and "bad days." (R. at 390.) Plaintiff likely would be absent from work as a result of the impairments or treatment more than four days per month. (R. at 391.)

Dr. Ham completed a Stroke Impairment Questionnaire dated February 23, 2011. (R. at 556–61.) This Stroke Impairment Questionnaire was submitted to the Appeals Council. (R. at 556–61.) Dr. Ham reported that Plaintiff received treatment every three to four months and that he had been most recently treated on February 23, 2010. (R. at 556.) Dr. Ham indicated that Plaintiff had a CVA on March 2, 2008 and a right carotid artery dissection. (R. at 556.) Plaintiff was diagnosed with left side neglect, poor eyesight, left arm and leg weakness, chronic headaches and fatigue. (R. at 556.) Dr. Ham gave Plaintiff a poor prognosis and reported that it was unexpected to change. (R. at 556.) Dr. Ham reported clinical findings of sensory disturbance, loss of intellectual ability, left neglect, chronic fatigue and chronic headaches. (R. at 557.) She noted that the diagnostic test results that supported her diagnosis were MRI, EEG, clinical exam and CT Scan. (R. at 557.) Dr. Ham noted that all studies confirmed severe right brain injury and total occlusion of the right internal carotid artery. (R. at 557.)

Plaintiff's symptoms were poor coordination, loss of manual dexterity, weakness, slight paralysis, unstable walking, numbness or tingling, sensory disturbance, pain, fatigue, difficulty concentrating, headaches, difficulty remembering, depression, personality change, difficulty solving problems, problems with judgment and double or blurred vision/partial or complete blindness. (R. at 558.) Dr. Ham reported that Plaintiff's symptoms and functional limitations were reasonably consistent with the physical and/or emotional impairments described in the evaluation. (R. at 558.) Also, Dr. Ham stated that Plaintiff had significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross

10

and dexterous movement or gait and station. (R. at 558.) Plaintiff was able to walk independently, but left weakness and left neglect with vision loss made independent walking dangerous. (R. at 559.) Dr. Ham estimated that Plaintiff could stand or walk for one hour or less in an eight-hour workday and could sit for eight hours. (R. at 559.) Plaintiff could frequently lift or carry zero to ten pounds, occasionally lift or carry ten to twenty pounds and never lift or carry twenty to fifty pounds or over fifty pounds. (R. at 559.)

Dr. Ham reported that Plaintiff was not a malingerer and that he experienced symptoms severe enough to interfere with attention and concentration constantly. (R. at 560.) She stated that Plaintiff was capable of tolerating low work stress. (R. at 560.) Also, she reported that Plaintiff's impairments were not likely to produce "good days" and "bad days." (R. at 560.) Dr. Ham noted other limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis such as his limited vision, his need to avoid heights, and his inability to push, pull and kneel. (R. at 561.) In conclusion, Dr. Ham reported that in her opinion, Plaintiff was deserving of disability, because he has severe chronic deficits resulting from a large, severe stroke. (R. at 561.)

Dr. Ham completed a final report on April 6, 2011, that restated the same findings previously detailed in her other reports. (R. at 503–505.) Also, in a note written on July 22, 2011, Dr. Ham wrote that although Plaintiff is able to sit for eight hours, he is unable to concentrate/focus for more than twenty to thirty minutes due to cognitive impairment, headaches and fatigue. (R. at 555.) She retracted her report that Plaintiff could sit and work for eight hours in an eight-hour workday and stated that Plaintiff was unable to sit and work more than one hour in an eight-hour workday. (R. at 555.)

11

3.      Francis Figueroa, M.D. — SSA Consulting Ophthalmologist.

On April 2, 2009, Francis Figueroa, M.D. performed a consultative ophthalmological examination of Plaintiff. (R. at 357–59.) Plaintiff reported having a lazy right eye throughout his life. (R. at 357.) On physical examination, his vision was refracted to 20/16 in his right eye with a hyperopic and astigmatic correction. (R. at 357.) His left eye was 20/25 uncorrected with normal intraocular pressures and normal pupil response. (R. at 357.) Plaintiff's confrontational visual fields appeared to be full in both eyes. (R. at 357.) On a dilated fungus exam, the lenses were clear, the optic nerves appeared pink and healthy, and there was no evidence of any retinopathy. (R. at 357.) A Goldmann Visual Field revealed that Plaintiff's right eye was read as full with a slight nasal deficit and his left eye was noted to have slight temporal defect. (R. at 357.) Further, Plaintiff was diagnosed with a lazy right eye or amblyopia of the right eye and status post-CVA was made. (R. at 357.)

4.      The Opinions of Non-treating State Agency Doctors.

On April 14, 2009, Juan Astrue, M.D., a non-treating state agency physician, opined that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of light work. (R. at 361–66.) Dr. Astrue reported that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. at 361.) Plaintiff could stand and/or walk for about six hours in an eight-hour workday and could sit for about six hours in an eight-hour workday with normal breaks. (R. at 361.) Dr. Astrue stated that Plaintiff's ability to push and/or pull, including operation of hand/foot controls, was unlimited. (R. at 361.) Plaintiff could occasionally climb ramps or stairs and frequently balance, stoop, kneel, crouch or crawl. (R. at 362.) Dr. Astrue reported that Plaintiff had no manipulative, visual or communicative

12

limitations. (R. at 362–63.) Also, Dr. Astrue noted that Plaintiff could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation. (R. at 363.) Plaintiff should avoid even moderate exposure to hazards such as machinery or heights. (R. at 363.)

Dr. Astrue considered Plaintiff's medical history, his ADLs and his response to treatment when determining whether Plaintiff's statements regarding his symptoms and their effects were credible. (R. at 366.) Plaintiff stated that he did not perform many household chores; however, Dr. Astrue noted that the overall evidence suggested that he had the ability to care for himself and take care of his home. (R. at 366.) Plaintiff did not require an assistive device to ambulate. (R. at 366.) Based on Plaintiff's statements, his ADLs and his response to treatment, Dr. Astrue found that Plaintiff's statements were partially credible. (R. at 366.)

On October 1, 2009, Robert Chaplin, M.D., an internal medicine specialist working with the state agency, affirmed Dr. Astrue's April 14, 2009 assessment of Plaintiff's file. (R. at 381.) Dr. Chaplin reported that new medical evidence and new vision testing did not suggest that any changes needed to be made to the RFC. (R. at 381.)

        5.      Plaintiff's Testimony.

On November 23, 2010, Plaintiff testified before an ALJ, stating that he was single and lived in a house with his mother and her boyfriend. (R. at 36.) He was not receiving any income and had not worked anywhere since the alleged onset date in March 2008. (R. at 36.)

Plaintiff had really serious headaches every day, weakness in his left arm and leg, and Plaintiff stated that he was depressed. (R. at 37.) Plaintiff was in constant pain from his daily headaches and rated the pain at an eight on a scale of one to ten. (R. at 37–38.) He stated that

13

movement and thinking worsened his headaches. (R. at 38.) Plaintiff took Amitriptyline in the morning and at night to prevent the headaches, and he took a pain pill when he experienced a headache. (R. at 38–39.) The medications that Plaintiff took on a daily basis made his mouth dry and made him sleepy. (R. at 39.) Plaintiff stated that the headaches lasted until he took the medication and that it took about a half hour for the medication to kick in. (R. at 39.)

Plaintiff could walk for twenty to thirty minutes and stand for about thirty minutes before needing to sit down. (R. at 40.) It did not hurt him to sit, but he stated that anxiety would keep him from sitting for long periods of time. (R. at 40.) Plaintiff was able to raise his left arm over his shoulder and stated that he was sometimes able to grasp and hold onto a jar, but it would be hard for him to maintain holding it. (R. at 41.) He was able to manipulate and move his left fingers, but it would take a conscious effort to do so. (R. at 42.) Plaintiff had no difficulty with his right hand. (R. at 42.) He stated that he could lift about twenty pounds. (R. at 44.)

The medication that Plaintiff took in the morning and at night for his headaches was also used to treat his depression. (R. at 42.) He was not seeing any counselor or therapist for his depression and the medication was prescribed by Dr. Ham. (R. at 42.) As a result of his depression, Plaintiff felt sad and did not want to socialize with friends. (R. at 43.) Plaintiff stated that he also had problems with left peripheral vision, but that he had no difficulties with right peripheral vision. (R. at 44.) He did not have a problem seeing straight ahead, but he found it difficult to see when he started moving to his left and found it hard to see oncoming traffic or people on his left side. (R. at 44.)

Plaintiff went grocery shopping with his mother, but he sometimes got tired and had to sit on the bench. (R. at 44-45.) He sometimes did laundry and cooked every once in a while, but

14

most of the time he fixed leftovers. (R. at 45.) Plaintiff did not participate in hobbies, organizations or events, because he was tired and did not want to associate with people. (R. at 45-46.)

On a typical day, Plaintiff would get up in the late morning, lie around the house and watch television or get on the computer. (R. at 47.) He used the computer a few times a week and would check his email and Facebook account. (R. at 47.) When using the computer, he would type with his right hand, because he was unable to coordinate his left hand to press the keys. (R. at 56–57.) Plaintiff usually made a sandwich for lunch. (R. at 48.) He stated that he got tired after going up and down steps and hanging the laundry outside on the clothes line. (R. at 48.) Plaintiff used public transportation after his stroke while he lived in Rhode Island, but he stopped, because there was no public transportation available where he was living at the time of the hearing. (R. at 49–50.)

6.    Plaintiff's Reported ADLs.

Plaintiff completed an Adult Function Report on November 12, 2008, writing that he prepared sandwiches and meals, swept and mopped floors, wiped the table, washed dishes (although he had to take breaks) and shopped in stores and by computer. (R. at 195–96.) Plaintiff went outside three times a week, and when he did go out, he travelled by public transportation or rode in a car. (R. at 196.) Plaintiff reported that he was able to go out alone, but he was unable to drive, because he had lost a lot of sight in his left eye. (R. at 196.) Plaintiff was able to pay bills, count change, handle a savings account and use a checkbook/money orders. (R. at 196.) Some of his hobbies included watching television, using the computer, talking on the phone and visiting friends and family. (R. at 197.) He reported that the left side of his body

15

remained weak as a result of his condition and that this had affected his lifting, squatting, bending, standing, reaching, kneeling, talking, stair climbing, seeing, memory, completing tasks, concentration, following instructions and using hands. (R. at 198.) Plaintiff was able to walk a quarter of a mile before needing to stop and rest for about five to ten minutes. (R. at 198.) He stated that he was good at following written instructions and that he needed to take notes when he was given spoken instructions to remember. (R. at 198.) Plaintiff reported that he got along "ok" with authority figures and that he had never been fired or laid off from a job because of problems getting along with other people. (R. at 199.) He indicated that he had developed an extreme fear of anything sharp such as needles, razors or sharp edges; however, he also indicated that was able to shave. (R. at 194, 199.)

On November 12, 2008, Plaintiff completed a Pain Questionnaire. (R. at 191–92.) Plaintiff reported having pain in his lower stomach, intestines and head. (R. at 191.) He described the pain as aching, stabbing and cramping. (R. at 191.) Plaintiff wrote that he had the pain in his lower stomach three to four times a week for thirty minutes and the pain in his head once or twice a week randomly. (R. at 191.) Blood coming from an ulcer and food caused the pain in his lower stomach, and the cause of the pain in his head was unknown. (R. at 191.)

       7.     Vocational Expert Testimony.

An impartial Vocational Expert ("VE") testified during the hearing on November 23, 2010. (R. at 58–71.) The VE asserted that Plaintiff's work as a steward on a cruise liner was classified as light in exertion, that Plaintiff's work as a chef constituted light exertional level, that his work as a mental retardation aide was medium exertional, skilled labor, that his experience as a baker was classified as medium exertional, skilled labor and that his work as an innkeeper was

16

considered light in exertion. (R. at 59.) The ALJ asked the VE if jobs existed in the national economy for a hypothetical individual with Plaintiff's vocational profile and who could specifically: (1) lift/carry twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk and sit six hours in an eight-hour work day; (3) never climb ladders or scaffolding; (4) occasionally climb ramps and stairs; (5) perform frequent postural activities; (6) avoid even moderate exposure to hazards such as machinery and heights. (R. at 59–60.) The VE advised that the person could work a number of unskilled, light jobs, including as a case aide, with 140,200 jobs in the national economy, as a companion, with approximately 210,000 jobs in the national economy, or as a daycare worker, with 190,000 jobs in the national economy. (R. at 61.) The VE indicated that those jobs would still be available if the RFC were changed to indicate: (1) must avoid concentrated exposure to extremes of heat, cold, humidity, solvents and cleaners, fumes, odors, dust and gases; (2) not involved working in direct sunlight; (3) not involved with use of the left, non-dominant hand for reaching, grasping, handling on more than an occasional-level basis; (4) no more than an occasional level of left peripheral acuity vision from a stationary position, but this would not prevent the individual from shifting the head to the left to see off to the left. (R. at 61–62.)

The ALJ asked the VE if jobs would exist in the national economy for the same hypothetical previously offered, but with the RFC changed to indicate a sedentary exertional level. (R. at 62.) The VE asserted that examples of jobs available for that hypothetical individual would include a coordinator, with 53,400 jobs in the national economy, a scheduler, with 98,000 jobs in the national economy, and a referral and information aide, with 100,000 jobs nationally. (R. at 62.) Lastly, the ALJ asked the VE if there would be jobs available if the

17

previous hypothetical were used, but the RFC changed to unskilled, sedentary jobs. (R. at 63.) The VE advised that the person could work as an addresser, with 60,200 jobs nationally, as a civil service clerk, with 180,000 jobs in the national economy, or as a phone order clerk, with approximately 31,000 jobs in the national economy. (R. at 63–64.) The VE testified that those jobs would still be available if the RFC changed to indicate that the individual could not use the left non-dominant hand for any type of reaching and grasping. (R. at 64.)

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on May 29, 2008, claiming disability due to the residual effects of a stroke, including left-sided weakness, visual impairment and frequent headaches. (R. at 14.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 14.) On November 23, 2010, Plaintiff testified at a hearing before an ALJ. (R. at 14.) On January 6, 2011, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 11–28.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on August 30, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (R. at 1–6.)

---

[2]    Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

### III. QUESTIONS PRESENTED

1. Did substantial evidence support the ALJ's determination that Plaintiff did not meeting listing § 11.04?

2. Does substantial evidence in the record exist to support the ALJ's decision that Plaintiff's treating physician's opinions are entitled to little weight?

3. Does substantial evidence in the record exist to support the ALJ's decision that Plaintiff's statements concerning her symptoms are not credible?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence in the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

19

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

analysis requires him to prove that he has "a severe impairment . . . or combination of

impairments which significantly limit[s] [her] physical or mental ability to do basic work

activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect

on one's ability to function.  20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to

last, for twelve months or result in death, it constitutes a qualifying impairment, and the analysis

ends.  20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or equal a listed

impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to

determine whether the claimant can return to his past relevant work[4] based on an assessment of

the claimant's RFC[5] and the "physical and mental demands of work [the claimant] has done in

the past." 20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits

will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the

analysis, such that he must prove that his limitations preclude him from performing his past

relevant work.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

---

[4]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for
an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

[5]    RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record.  *Id.*

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A.    The ALJ's Opinion.

On November 28, 2011, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since March 2, 2008, his alleged onset date. (R. at 16.) At step two, the ALJ determined that Plaintiff was severely impaired from late effects of a cerebral vascular accident, hemianopia and headaches. (R. at 16.) At step three, the ALJ concluded that Plaintiff's impairments did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 17.)

The ALJ then determined that Plaintiff had the RFC to perform sedentary work, except that he should never climb ropes, ladders or scaffolding, only occasionally climb ramps and stairs and should avoid even moderate exposure to workplace hazards such as unprotected heights and moving machine parts. (R. at 17.) He should avoid concentrated exposure to extremes of heat, cold, humidity, solvents and cleaners, fumes, odors, dusts and gases. (R. at 17.) He is limited to jobs that require no more than occasional left peripheral acuity vision from a stationary position. (R. at 17.) Plaintiff should not work in direct sunlight and he requires a job that does not require use of the left non-dominant hand for reaching, grasping and handling on more than an occasional basis. (R. at 17.) He is limited to simple and unskilled work. (R. at 17.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform his past relevant work as a steward, chef, aide, baker or innkeeper. (R. at 21.) At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that occupations existed in significant numbers in the national economy that Plaintiff could perform. (R. at 22.) Specifically, the ALJ found that Plaintiff, regardless of his additional limitations, could work as an addresser, civil service clerk and phone order clerk. (R. at 22.) Therefore, the ALJ concluded that Plaintiff was not disabled and that he is not entitled to benefits. (R. at 22–23.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem.at 21.) In support of his position, Plaintiff first argues that the ALJ did not provide any explanation as to why Plaintiff's conditions did not meet the most applicable Medical Listing in

23

Appendix 1 of Subpart P, Medical Listing § 11.04 pertaining to impairments caused by cerebrovascular accident. (Pl.'s Mem. at 12.) Further, Plaintiff argues that the ALJ improperly afforded Plaintiff's treating physician's opinion less than controlling weight and that the ALJ failed to properly assess Plaintiff's credibility. (Pl.'s Mem. at 13, 18.) Defendant responds that substantial evidence supported the ALJ's decision. (Def.'s Mot. for Summ. J. and Mem. in Supp. "Def.'s Mem" (ECF No. 12) at 10–18.)

   B.     Substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria for listing § 11.04.

At the third step of the ALJ's analysis, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). The ALJ paid specific attention to §§ 2.02, 2.03, and 2.04 of the medical listings for visual impairments and found that the evidence of record did not establish that Plaintiff's impairments met the requirements of those sections. (R. at 17.) The ALJ also considered listing § 11.03, as the most appropriate listing for Plaintiff's headaches, and found that the record did not indicate that Plaintiff suffered from migraines more than once weekly and, thus, he did not meet the listing. (R. at 17.) Plaintiff contends that the ALJ "did not indicate whether he considered the most applicable Listing, 11.04, which relates to impairments caused by cerebrovascular accident." (Pl.'s Mem. at 12.) However, the ALJ stated that the evidence did not support a finding that Plaintiff met listing § 11.04B, and substantial evidence supports this finding. (R. at 17.)

24

The listings are a regulatory tool which enables the government to make decisions more efficiently by identifying claimants whose impairments are so severe that they are presumptively disabled, regardless of their age, education and work history. 20 C.F.R § 404.1525(a); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  For a claimant to qualify for benefits based on a showing that his impairment meets one of the listed impairments, he must present medical findings equal in severity to *all* of the criteria for the most similar listed impairment.  20 C.F.R. 404.1525(c)(3); *Zebley*, 493 U.S. at 531 (emphasis added).

Listing § 11.04 requires:

Central nervous system vascular accident.  With one of the following more than 3 months post-vascular accident:

A. Sensory or motor aphasia resulting in ineffective speech or communication; or

B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

20 C.F.R., pt. 404, Subpart P, Appendix 1. § 11.04.  Section 11.00C defines "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station" as:

Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R., pt. 404, Subpart P, Appendix 1. § 11.00(C).

25

Plaintiff argues that the decision lacks substantial evidence to support it, because the ALJ failed to offer any analysis or explanation as to why Plaintiff did not meet listing § 11.04. (Pl.'s Mem. at 12–13.) Defendant argues that substantial evidence throughout the ALJ's opinion supports the ALJ's finding that Plaintiff did not meet the requirements of listing § 11.04. (Def.'s Mem. at 11–12.)

At step three, the ALJ must clearly set forth the reasons for his decisions. *Diaz v. Comm'r of Social Sec. Admin.,* 577 F.3d 500, 504 (3d Cir. 2009). "Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Id.* In conducting his analysis, the ALJ should identify the relevant listed impairments and then compare the criteria of each listing with evidence of Plaintiff's symptoms. *Cook v. Heckler,* 783 F. 2d 1168, 1173 (4th Cir. 1986); *Brascher v. Astrue,* 2011 WL 1637029, at *4-5 (E.D. Va. Mar. 11, 2011). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook,* 783 F.2d at 1173. However, if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination. *Smith v. Astrue,* 457 Fed. App'x 326, 328 (4th Cir. 2000) (citing *Fisher-Ross v. Barnhart,* 431 F.3d 729, 733-34 (10th Cir. 2005)). The ALJ need only review the medical evidence once in the opinion to analyze Plaintiff's condition. *McCartney v. Apfel,* 28 Fed. App'x 277, 279 (4th Cir. 2002).

The ALJ, in finding that Plaintiff did not meet listing § 11.04, stated only that, "Section 11.04B requires evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, gait, or station. The evidence does not support such a finding." (R. at 17.) While the ALJ provided a brief

conclusion at step three, substantial evidence exists in the ALJ's opinion and in the record to support this finding.

Following his stroke, Plaintiff was seen by Physical and Occupational Therapy on a daily basis, and his conditions dramatically improved over the first two weeks of his stay. (R. at 259.) He regained strength in his left upper and lower extremities, his facial droop improved, and his mental status had returned to baseline. (R. at 258.)

Also, a physical examination on September 30, 2009 at Miriam Hospital revealed 4/5 motor strength in his left upper extremity and 5/5 motor strength in his left lower extremity. (R. at 333.) Further, when Plaintiff was examined at Rhode Island Hospital on March 5, 2009, an examination showed that he had a mild left pronator drift and a 4/+5 left arm extensor weakness and a left leg flexor weakness, but otherwise his strength was 5/5 bilaterally. (R. at 379.) Coordination testing revealed that he was intact to finger-nose and heel-shin testing. (R. at 379.) Regular toe, heel and tandem gaits were intact and his reflexes were 2+ on the right and 3+ on the left. (R. at 379.)

On October 6, 2010, Plaintiff's treating physician, Dr. Ham, stated that Plaintiff was stable. (R. at 446.) Plaintiff had 4/5 strength in his left arm and leg. (R. at 446–447.) Dr. Ham reported that Plaintiff had normal sensation and normal gait. (R. at 446.) Further, in the Stroke Impairment Questionnaire dated February 23, 2011, Dr. Ham stated that Plaintiff was able to walk independently. (R. at 559.)

On April 14, 2009, Dr. Astrue, a non-treating state agency physician, reported that Plaintiff could stand and/or walk about six hours in an eight-hour workday. (R. at 361.) Plaintiff had the ability to push and/or pull, including operation of hand/foot controls. (R. at 361.)

Further, Plaintiff could occasionally climb ramps or stairs and frequently balance, stoop, kneel, crouch or crawl. (R. at 362.) Dr. Astrue stated that Plaintiff did not have any manipulative, visual or communicative limitations. (R. at 362–63.) Dr. Astrue reported that the overall evidence suggested that Plaintiff had the ability to care for himself and take care of his home. (R. at 366.) Plaintiff did not need an assistive device to ambulate. (R. at 366.)

At the hearing on November 23, 2010, Plaintiff testified that he could walk for twenty to thirty minutes and stand for about thirty minutes. (R. at 40.) He was able to lift his left arm over his shoulder and stated that he was sometimes able to grasp and hold onto a jar. (R. at 40-41.) Plaintiff was able to manipulate and move his left fingers, and he stated that he had no difficulty with his right hand. (R. at 42.) Moreover, Plaintiff stated that he went grocery shopping with his mother, sometimes did laundry and was able to cook meals. (R. at 45.) He used the computer a few times a week to check his email and Facebook account. (R. at 47.)

On the Adult Function Report dated November 12, 2008, Plaintiff wrote that he prepared sandwiches and meals, swept and mopped floors, wiped the table, washed clothes and shopped in stores and by computer. (R. at 195–96.) He also wrote that he was able to walk a quarter of a mile. (R. at 198.)

Therefore, while the ALJ provided only a brief explanation at step three, substantial evidence supports the ALJ's determination that Plaintiff's condition did not meet the requirements of listing § 11.04.

28

C.   The ALJ did not err in assigning Plaintiff's treating physician's opinion less than controlling weight.

Plaintiff argues that the ALJ erred by failing to afford Plaintiff's treating physician's opinion controlling weight. (Pl's Mem. at 13–18.) Specifically, Plaintiff contends that the ALJ failed to give appropriate reasons for not granting controlling weight to the opinions of his treating neurophysiologist, Dr. Ham, and his treating optometrist, Dr. Bradley. (Pl.'s Mem. at 15–18.) Defendant responds that substantial evidence supports the ALJ's determination to afford Dr. Ham and Dr. Bradley's opinions less than controlling weight. (Def.'s Mem. at 12–15.)

The ALJ gave Dr. Ham's opinion little weight, because it was contrary to the other evidence of record, including the routine and conservative treatment performed by Dr. Ham, and the limitations that she assigned were extreme and inconsistent with Plaintiff's testimony. (R. at 21.) The ALJ gave appropriate weight to the opinion of Dr. Bradley and considered the opinion when formulating Plaintiff's RFC. (R. at 21.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with

29

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, for example, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e); *Jarrells v. Barnhart*, No. 7:04cv411, 2005 U.S. Dist. LEXIS 7459, at *9-10 (W.D. Va. Apr. 26, 2005).

When evaluating a treating physician's opinion, the ALJ must consider: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6). However, the regulations vest the ALJ, not the treating physician, with the authority to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1).

Here, the ALJ assigned less than controlling weight to the opinions of Dr. Ham and Dr. Bradley, because they were inconsistent with the objective findings, the conservative nature of Plaintiff's medical treatment and Plaintiff's admitted ADLs. (R. at 18–21.) In considering the

30

objective medical evidence of record, Plaintiff's ADL and his course of medical treatment, the ALJ found that Plaintiff's RFC enabled him to perform limited sedentary work. (R. at 17–21.)

      1.  Dr. Ham's Opinion.

Dr. Ham's opinion was inconsistent with her own treatment notes. Despite reporting that Plaintiff had no aphasia on April 14, 2010, (R. at 393–94), Dr. Ham noted that Plaintiff's aphasia was improving on October 6, 2010. (R. at 446.) On August 11, 2010, Dr. Ham noted that Plaintiff had 0/10 pain and wrote that Plaintiff reported that Elavil had really helped his headaches. (R. at 444.) However, in the Stroke Residual Functional Capacity Questionnaire dated September 2, 2010, Dr. Ham indicated that Plaintiff's condition was not likely to improve and reported pain as one of Plaintiff's symptoms. (R. at 386.) Also, although Dr. Ham reported Plaintiff had a normal gait on October 6, 2010, (R. at 446), she stated in the Stroke Residual Functional Capacity Questionnaire that Plaintiff had balance problems, poor coordination and would need to use a cane or other assistive device for occasional walking or standing. (R. at 386, 388.) Also, in the Stroke Impairment Questionnaire, Dr. Ham wrote that Plaintiff's walking was unstable, (R. at 558), but then also reported that Plaintiff was able to walk independently. (R. at 559.)

In the Stroke Residual Functional Capacity Questionnaire, Dr. Ham reported that Plaintiff's impairments would likely produce "good days" and "bad days," (R. at 390), but in the Stroke Impairment Questionnaire dated February 23, 2011, Dr. Ham stated that Plaintiff's impairments were not likely to produce "good days" and "bad days." (R. at 560.) During several visits, Dr. Ham reported that Plaintiff was alert, awake and oriented, (R. at 444, 446), but in the Stroke Impairment Questionnaire she reported that Plaintiff's symptoms would interfere

with attention and concentration *constantly.* (R. at 560) (emphasis added.) Further, Dr. Ham

originally reported that Plaintiff could sit for eight hours in an eight-hour workday, (R. at 559),

but then retracted this statement and wrote that although Plaintiff would be able to sit for eight

hours, he would be unable to concentrate/focus for more than twenty to thirty minutes and, thus,

would be unable to sit and work more than one hour in an eight-hour workday. (R. at 555.) As

noted, this statement was made after several visits during which Dr. Ham reported Plaintiff was

alert, awake and oriented. (R. at 444, 446.)

  Dr. Ham's opinion was also contrary to the opinions of other doctors in the record. Dr.

Ham reported dizziness and loss of intellectual ability as some of Plaintiff's symptoms. (R. at

386, 557.) However, Miriam reported that Plaintiff's mental status had returned to baseline

before he was discharged on April 5, 2008, (R. at 259), and on January 28, 2010, Plaintiff stated

that his headaches did not involve dizziness. (R. at 433.) Also, Dr. Ham diagnosed Plaintiff

with a poor prognosis and reported that it was unexpected to change, (R. at 556), even though

Plaintiff reported feeling better and that medication was helping his headaches on several

occasions. (R. at 435, 432.) Dr. Ham reported that Plaintiff constantly would experience

symptoms severe enough to interfere with attention and concentration, (R. at 560), and Dr.

Bradley reported that Plaintiff's experience of pain or other symptoms were never severe enough

to interfere with his attention and concentration. (R. at 453.)

  In the Stroke Residual Capacity Questionnaire, Dr. Ham stated that Plaintiff could never

lift less than ten pounds. (R. at 387.) Plaintiff could never twist, stoop, crouch, climb ladders or

climb stairs. (R. at 387.) Dr. Ham reported that Plaintiff had significant limitations in reaching,

handling or fingering. (R. at 387.) Plaintiff could not use his left hand to grasp, turn or twist

32

objects during an eight-hour working day. (R. at 387.) He could use his right hand 50% of the time to grasp, turn or twist objects during an eight-hour workday. (R. at 387.) He could use his right fingers for fine manipulations 75% of the time and could not use his left fingers for fine manipulations at all. (R. at 387.) Plaintiff could use his right arm for reaching 50% of the time during an eight-hour workday and could not use his left arm at all during the day. (R. at 387.) Dr. Ham reported that Plaintiff could sit for less than two hours total in an eight-hour workday. (R. at 388.) Plaintiff would need to take unscheduled breaks about every forty-five minutes during an eight-hour workday. (R. at 388.) Plaintiff would have to rest for about sixteen hours before returning to work. (R. at 388.)

Dr. Ham stated that with prolonged sitting, Plaintiff's legs should be elevated at about thirty to forty-five degrees. (R. at 388.) If Plaintiff had a sedentary job, he would need to elevate his legs 25% of the time. (R. at 388.) Also, Plaintiff would need to use a cane or other assistive device for occasional standing or walking. (R. at 388.) Further, Dr. Ham reported that Plaintiff could walk zero city blocks without rest and could only sit for forty-five minutes at a time before needing to get up. (R. at 389.) Dr. Ham reported Plaintiff could stand for zero hours at a time before needing to sit down or walk around. (R. at 389.)

Dr. Ham's opinion also was inconsistent with the opinion of the non-treating state agency physician, Dr. Astrue. Dr. Astrue reported that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. at 361.) He opined that Plaintiff could stand and/or walk for about six hours in an eight-hour workday and could sit for about six hours in an eight-hour workday with normal breaks. (R. at 361.) Dr. Astrue stated that Plaintiff's ability to push and/or pull, including operation of hand/foot controls, was unlimited.

33

(R. at 361.) Plaintiff could occasionally climb ramps or stairs and frequently balance, stoop, kneel, crouch or crawl. (R. at 362.)

Finally, Dr. Ham's opinion was contrary to Plaintiff's testimony. Dr. Ham reported that Plaintiff could never lift less than ten pounds, that he could not use his left hand to grasp, turn or twist objects during an eight-hour workday, that he could use his right hand to grasp, turn or twist objects during an eight-hour workday, that he could use his right fingers for manipulations 75% of the time, that he could use his right arm for reaching 50% of the time and that he could not use his left fingers or arm at all during the day. (R. at 387.) However, Plaintiff testified that he could lift about twenty pounds, that he was able to raise his left arm over his shoulder, that he could sometimes grasp and hold onto a jar, that he was able to manipulate and move his left fingers and that he had no difficulty with his right hand. (R. at 40–42.) Dr. Ham reported that Plaintiff could sit for less than two hours total in an eight-hour workday, (R. at 388), while Plaintiff stated that it did not hurt him to sit. (R. at 40.)

Dr. Ham stated that Plaintiff could walk zero city blocks without rest, (R. at 389), and Plaintiff reported that he could walk a quarter of a mile before needing to stop and rest. (R. at 198.) Also, Dr. Ham reported that Plaintiff needed to avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases, solvents/cleaners and chemicals, (R. at 390), while Plaintiff stated that exposure to fumes, odors, and solvents/cleaners would not cause any physical difficulties for him. (R. at 53.) Further, despite his impairments, Plaintiff reported going grocery shopping with his mother, doing laundry, occasionally cooking, watching television, using the computer to check his email and Facebook account, using public transportation, sweeping and

34

mopping the floors, going shopping in stores and on the computer, and handling his own finances. (R. at 44–47, 196–97.)

Because Dr. Ham's opinion was inconsistent with her medical records and the record as a whole, substantial evidence supports the ALJ's determination to afford Dr. Ham's opinion little weight, rather than controlling weight.

### 2. Dr. Bradley's Opinion.

The ALJ assigned Dr. Bradley's opinion appropriate weight and took it into consideration when formulating Plaintiff's RFC. (R. at 21.) Plaintiff argues that the ALJ did not incorporate any of the limitations identified by Dr. Bradley into his RFC. (Pl.'s Mem. at 17.) Defendant contends that the ALJ reasonably evaluated Dr. Bradley's opinion and took it into consideration when formulating Plaintiff's RFC. (Def.'s Mem. at 15.)

Dr. Bradley reported that Plaintiff was visually impaired secondary to cerebral visual accident resulting in a left homonymous hemianopsia. (R. at 383.) Plaintiff's uncorrected distance visual acuities were 20/100 in his right eye and 20/50 in his left eye. (R. at 383.) Plaintiff's uncorrected near visual acuities were 1M in his right eye and .8M in his left eye. (R. at 383.) Plaintiff complained of headaches, especially in the sunlight. (R. at 384.) In the Vision Impairment Questionnaire dated November 3, 2010, Dr. Bradley reported that the prognosis of Plaintiff's right and left eyes was stable. (R. at 449–450.) The clinical findings that supported Dr. Bradley's diagnoses were a 20/20 central visual acuity in Plaintiff's right and left eyes, restricted field of vision on the right and left, limited visual efficiency on the right and left, and difficulty with mobility on the right and left. (R. at 450–51.) Plaintiff had no vision on the left side, bumped into obstacles on the left and lost his place when reading. (R. at 452.) Also, Dr.

35

Bradley reported that Plaintiff's experience of pain or other symptoms were never severe enough to interfere with attention and concentration. (R. at 453.) Plaintiff would need to take unscheduled breaks every two hours to rest during an eight-hour workday, and he would need to rest for fifteen minutes before returning to work as a result of his vision problems. (R. at 453.) Dr. Bradley stated that Plaintiff's impairments were unlikely to produce "good days" and "bad days." (R. at 453.) Plaintiff would need to be absent from work less than once a month. (R. at 454.)

The ALJ took the limitations found by Dr. Bradley into consideration when formulating Plaintiff's RFC. The ALJ found that Plaintiff had the RFC to perform a limited range of sedentary work that never involved the climbing of ropes, ladders or scaffolding, only occasional climbing of ramps and stairs, less than moderate exposure to unprotected heights and moving machine parts, no exposure to direct sunlight and no more than occasional left peripheral acuity vision from a stationary position. (R. at 17.) The ALJ clarified that a RFC limiting Plaintiff to no more than an occasional level of left peripheral acuity vision from a stationary position would not prevent the individual from shifting the head to the left to see off to the left. (R. at 62.) Thus, the ALJ reasonably evaluated Dr. Bradley's opinion and assigned it appropriate weight.

D.     The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, because it was not supported by substantial evidence and the correct legal standard was not applied. (Pl.'s Mem. at 18.) Defendant contends that the ALJ reasonably assessed Plaintiff's credibility and that the ALJ credited Plaintiff's subjective complaints to some extent by limiting him to a reduced range of sedentary, unskilled work. (Def.'s Mem. at 15.)

36

Here, the ALJ determined that Plaintiff's impairment could reasonably be expected to cause some of the alleged symptoms, but that Plaintiff's statements about the intensity, persistence and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment, which indicated that Plaintiff could perform a reduced range of sedentary, unskilled work. (R. at 17–18.) The ALJ's determination regarding Plaintiff's credibility is supported by substantial evidence in the record, because Plaintiff's claims were inconsistent with his reported daily activities and with the medical evidence.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent

37

to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

Plaintiff claims that he is unable to work because of the residual effects of a stroke, including left sided weakness, visual impairment and frequent headaches. (R. at 18.) However, Plaintiff indicated that he was able to raise his left arm over his shoulder and that he was sometimes able to grasp and hold onto a jar, but that it would be difficult to maintain holding it. (R. at 41.) Plaintiff stated that he had difficulties with his left peripheral vision, but admitted to having no problems seeing straight ahead. (R. at 44.) Also, Plaintiff reported several times that medication improved his headaches. (R. at 435, 432.) His medication did not make him feel nauseous or cause him to vomit, but it did make him sleepy. (R. at 39.) His headaches lasted until he took his medication, and it took about a half hour for it to kick in. (R. at 39.)

Plaintiff stated that it did not hurt him to sit, but that anxiety would keep him from sitting for long periods of time. (R. at 40.) He reported that he could walk for twenty to thirty minutes and was able to stand for thirty minutes. (R. at 40.) He does not drive due to his vision problems, but was able to use public transportation. (R. at 43, 49–50.) Plaintiff indicated that he went grocery shopping with his mother, sometimes did laundry, cooked every once in a while, fixed leftovers, watched television and used the computer to check his email and Facebook account. (R. at 45–47.) He could type on the computer, but used only his right hand. (R. at 56–57.) Also, in the Adult Function Report, Plaintiff wrote that he prepared meals, swept and

38

mopped floors, wiped the table, washed clothes and shopped in stores and on the computer. (R. at 195–96.) Plaintiff also reported handling his own finances. (R. at 196.) Plaintiff stated that he was good at following written instructions and could follow spoken instructions but would need to take notes to remember. (R. at 198.) Moreover, Plaintiff testified that he no longer went to any kind of therapy for the effects of his stroke. (R. at 50.)

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Therefore, the ALJ did not err in reaching his credibility evaluation, because substantial evidence supported his decision.

## VI. CONCLUSION

For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to and all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: September 3, 2013

40